Maxine B. COUSIN, et al.

v.

Ned McWHERTER, et al.

No. CIV–1–90–339.

United States District Court,
E.D. Tennessee,
at Chattanooga.

Sept. 28, 1995.

J. Kenneth Porter, Newport, TN, pro se.

Myron B. McClary, Chattanooga, TN, Margaret Carey, Center for Constitutional Rights, Greenville, MS, Laughlin McDonald, Neil Bradley, Kathleen L. Wilde, American Civil Liberties Union Foundation, Atlanta, GA, Richard H. Dinkins, Williams & Dinkins, Nashville, TN, for Maxine B. Cousin, Lorenzo E. Ervin, Ezra B. Harris, Johnny B. Holloway, G.A. Key, Sr., Buford McElrath, Annie D. Thomas, Greg Walton, Bobby Ward, Ella Bryant.

Michael W. Catalano, State of Tennessee, Office of the Attorney General, Nashville, TN, for Ned Ray McWherter, Tennessee Election Commission, Will Burns, Hamilton County Election Commission, Steve Conrad.

## ORDER

HULL, District Judge.

This voting rights action is before the Court on remand from the Sixth Circuit Court of Appeals for specific findings of fact and conclusions of law. Plaintiffs brought this action alleging violations of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 and the fifteenth amendment of the United States Constitution. Plaintiffs are black adult residents and voters in Hamilton County, Tennessee.

Plaintiffs instituted this action on August 31, 1990. Plaintiffs allege that Hamilton County's use of at-large elections for judges of the Eleventh Judicial Circuit of Hamilton County, Tennessee, and for the judges of the Court of General Sessions in Hamilton County, has a discriminatory result. The plaintiffs seek both declaratory and injunctive relief.

Plaintiffs Maxine B. Cousin, Lorenzo E. Ervin, Jr., Ezra B. Harris, George A. Key, Sr., Buford McElrath, Bobby Ward, Ella Bryant, and Johnny D. Holloway are African Americans, and are registered voters of Hamilton County, Tennessee.

Plaintiffs contend that the at-large, circuit-wide method of electing the nine judges of the Eleventh Judicial Circuit of Tennessee and the three judges of the Court of General Sessions of Hamilton County dilutes the voting strength of African–American residents of Hamilton County in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the first, thirteenth, fourteenth, and fifteenth amendments of the Constitution of the United States. The defendants contend that the state interest in maintaining the method of electing judges with their jurisdiction being coextensive with the electorate outweighs any dilution, and that the plaintiffs are entitled to no relief.

Pursuant to T.C.A. § 16–2–506(11)(A), the Eleventh Judicial Circuit consists of "nine incumbent trial court judges and the district attorney currently residing in [Hamilton] County [who] shall continue to serve the Eleventh Judicial District in their respective capacities." Pursuant to T.C.A. § 16–2–502 "[e]ach trial judge shall continue to be officially known and designated as either a chancellor, circuit court judge, criminal court judge, or law and equity court judge depending upon the provision to which he or she was elected or appointed prior to June 1, 1984."

In Hamilton County there are four Circuit Court judges, three Criminal Court judges, and two Chancery Court judges of the Eleventh Judicial Circuit, and three General Sessions Court judges. All judges are elected at-large, county-wide to eight-year terms. Tenn. Const. Art. VI, § 4; T.C.A. § 17–1–103; 1941 Tenn. Priv. Acts, ch. 6. There is no district or ward residency requirement and candidates must designate the particular division or court to which they seek election. T.C.A. § 17–1–103; 1984 Tenn. Priv. Acts, ch. 176. Elections of these judges in Hamilton County are partisan.

## ELEMENTS OF A SECTION 2 CLAIM

### GINGLES FACTORS

In *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1978), the Court delineates preconditions to establish that multimember districts operate to impair minority voters' ability to elect representatives of their choice. These factors are

(1) The minority group is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group is politically cohesive; and

(3) The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

■ In addition, the Court must find a reasonable alternative practice as a benchmark against which to measure the voting practice. *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2586, 129 L.Ed.2d 687, 695 (1994). A voting practice cannot be challenged as dilutive under Section 2, where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice. *Holder, supra* at ——, 114 S.Ct. at 2586, 129 L.Ed.2d at 695.

According to the 1990 Census, the population of Hamilton County is 285,536 people, of whom 54,477 (19%) are black. The largest concentration of blacks in Hamilton County is in Chattanooga, the county seat. The population of Chattanooga is 152,466, of whom 51,338 (33.7%) are black. Only 3,139 (5.8%) of the county's blacks live outside Chattanooga. As of October, 1989 there were 140,164 registered voters in Hamilton County, 24,824 (17.7%) of whom were black, 97,306 (69.4%) of whom were white, and 18,034 (12.9%) whose race was unknown. Blacks were 20% and whites were 80% of the 122,130 registered voters whose race was known.

■ The Court finds that the population of blacks in Hamilton County is sufficiently large and geographically compact so that blacks would constitute a majority in one or more single member districts. The Court also finds that the three and four-seat district configurations submitted by the plaintiffs are "reasonable benchmarks" to evaluate the challenged voting practice in this case. *Holder, supra* at ——, 114 S.Ct. at 2586, 129 L.Ed.2d at 695.

Based upon a four-seat configuration, corresponding to the number of judges for the Circuit Court of the Eleventh Judicial Circuit, blacks would constitute both population and voting age population (VAP) majorities in one district, and the total deviation among districts would be less than 10%. Plaintiffs have filed a proposed plan for the four districts for the Circuit Court which is further evidence that blacks are geographically compact, because in order to create four districts, there was no need to divide a single existing precinct.

Plaintiffs' submitted plan for four districts is supported by the following chart with the districts shown on Draft 4 which also follows:

### Hamilton County, TN

#### 4 Districts    4 Members

| District | Total | Black | Total VAP | Black VAP | % Black | % Black VAP | Dev. | % Dev. | # of members |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 73222 | 3040 | 56615 | 2081 | 4.2% | 3.7% | 1838 | 2.57% | 1 |
| 2 | 69839 | 45360 | 51486 | 30908 | 64.9% | 60.0% | −1545 | −2.16% | 1 |
| 3 | 72055 | 4165 | 56195 | 2894 | 5.8% | 5.1% | 671 | 0.94% | 1 |
| 4 | 70420 | 1912 | 52230 | 1312 | 2.7% | 2.5% | −964 | −1.35% | 1 |

| TOTAL | 285536 | 54477 | 216526 | 37195 | 19.1% | 17.2% |
|---|---|---|---|---|---|---|

MAXIMUM DEVIATION = 4.74%
IDEAL DISTRICT SIZE = 71384 Single-member

Draft 4–District Plan — Hamilton County, TN 3/1/93

Also, based upon a three-seat configuration, corresponding to the number of judges for the Criminal Court and Court of General Sessions, the Court finds that blacks would constitute a majority in regard to voting age population and population in one district, and the total deviation among districts would be less than 10%. Plaintiffs have filed a proposed plan for the three districts for the Criminal Court and Court of General Sessions which is again further evidence that blacks are geographically compact, because in order to create three districts, there was no need to divide a single existing precinct.

Plaintiffs' submitted plan for three districts is supported by the following chart with the districts shown on Draft 3 which also follows:

Hamilton County, TN

3 Districts     3 Members

| District | Total | Black | Total VAP | Black VAP | % Black | % Black VAP | Dev. | % Dev. | # of members |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 98735 | 2191 | 74722 | 1487 | 2.2% | 2.0% | 3556 | 3.74% | 1 |
| 2 | 88289 | 48622 | 65733 | 33055 | 55.1% | 50.3% | −6890 | −7.24% | 1 |
| 3 | 98512 | 3664 | 76071 | 2653 | 3.7% | 3.5% | 3333 | 3.50% | 1 |
| TOTAL | 285536 | 54477 | 216526 | 37195 | 19.1% | 17.2% | | | |

MAXIMUM DEVIATION  = 10.98%
IDEAL  DISTRICT  SIZE  = 95179 Single-member

Draft 3-District Plan — Hamilton County, TN 3/1/93

Based upon a two-seat configuration, corresponding to the number of judges for the Chancery Court, blacks do not constitute a majority in a single-member district, but would constitute an influence district in one district which will be discussed further in this opinion.

The Court also finds the second *Gingles* precondition, because the Court finds that blacks in Hamilton County are politically cohesive in that they tend to vote as a bloc. The political cohesiveness of blacks in Hamilton County as well as the third *Gingles* precondition that the white majority votes sufficiently as a bloc to usually enable it to defeat

the minority's preferred candidate is established in this case from the racial bloc voting analysis performed by the plaintiffs' expert Dr. Steven Cole. Dr. Cole, stipulated to be an expert in racial bloc voting, testified as follows:

Q. NOW, HAVE YOU IDENTIFIED PLAINTIFFS' EXHIBIT 313?

A. I HAVE.

Q. AND WHAT IS THAT, DR. COLE?

A. THIS IS A SUMMARY OF THE VARIOUS STATISTICAL ANALYSIS— ANALYSES THAT I COMPLETED. IT'S BROKEN UP INTO A NUMBER OF PARTS. THE FIRST PART ARE THE RESULTS OF REGRESSION ANALYSES FOR JUDICIAL CONTESTS, SECOND PART ARE COUNTY-WIDE OFFICES ANALYSES OF BOTH HOMOGENEOUS ANALYSES AND ECOLOGICAL REGRESSION, THIRD PART IS A SUMMARY OF HOMOGENEOUS PRECINCT ANALYSES, THE FIFTH PART ARE SOME TURNOUT ESTIMATES FOR CONTESTS IN HAMILTON COUNTY.

Q. ALL RIGHT. NOW, LET ME DIRECT YOUR ATTENTION TO THE FIRST PART OF YOUR ANALYSIS ON PAGE 1. HOW MANY JUDICIAL CONTESTS WERE THERE AND WHAT WAS THE NATURE OF THOSE CONTESTS?

A. THERE WERE FOUR CITY JUDGE CONTESTS AND THERE WAS A SUPREME COURT CONTEST IN 1980.

Q. AND WHAT IN THE FIRST COLUMN ON THAT PAGE, TELL ME WHAT THOSE PERCENTS REPRESENT?

A. OKAY. THESE ARE—BOTH COLUMNS ARE ESTIMATES FROM REGRESSION ANALYSES. THE FIRST COLUMN ARE ESTIMATES OF THE PERCENTAGE OF AFRICAN–AMERICAN VOTERS WHO VOTED FOR THE AFRICAN–AMERICAN CANDIDATE. IN EACH OF THESE CONTESTS THERE WAS ONE AFRICAN–AMERICAN CANDIDATE. THESE WERE HEAD–TO–HEAD CONTESTS; SO,

FOR EXAMPLE, IN 1969 IN THE CITY JUDGE CONTEST INVOLVING THE AFRICAN–AMERICAN CANDIDATE HARRIS, HARRIS RECEIVED 96 PERCENT OF THE VOTE OF AFRICAN–AMERICAN VOTERS.

Q. AND WHAT ABOUT IN THE 1979 CONTEST INVOLVING TIMBER-LAKE?

A. IN 1979, THAT CONTEST, TIMBERLAKE RECEIVED 11 PERCENT SUPPORT FROM THE AFRICAN–AMERICAN VOTERS.

Q. AND BROWN 77 PERCENT, IS THAT CORRECT, TO SPEED US UP A LITTLE BIT?

A. THAT'S CORRECT.

Q. AND, DR. COLE, TELL ME NOW WHAT THE PERCENTAGES IN THE SECOND COLUMN ARE?

A. SECOND COLUMN ARE ESTIMATES OF THE PERCENTAGE OF WHITE VOTERS WHO VOTED FOR THE WHITE CANDIDATE OR CANDIDATES.

THE COURT: MR. MCDONALD, WHAT PAGE ARE WE ON?

MR. MCDONALD: PAGE 1, THE FIRST PAGE.

THE COURT: ALL RIGHT, ALL RIGHT.

Q. AND TELL ME AGAIN NOW THE PERCENTAGES SHOW WHAT?

A. OKAY, SIR, THAT FIRST COLUMN IS SUPPORT OF THE AFRICAN–AMERICAN CANDIDATES BY AFRICAN-AMERICAN VOTERS. SECOND COLUMN ARE THE ESTIMATES OF PERCENT OF WHITE VOTERS VOTING FOR WHITE CANDIDATES.

Q. NOW, IS THAT, THAT ESTIMATE OF THE PERCENT, IS THAT BASED ON PRECINCT POPULATION OR VOTING AGE POPULATION OR TURNOUT OR WHAT, DR. COLE?

A. FOR THE CONTESTS PRIOR TO THE LATE 1980'S, THEY'RE BASED ON POPULATION DATA. FOR THE CONTESTS AFTER 1987, I BELIEVE,

THEY'RE BASED ON VOTING AGE POPULATION.

Q. ALL RIGHT. WOULD ONE BE IN YOUR VIEW MORE ACCURATE THAN THE OTHER?

A. I WOULD PREFER, I WOULD PREFER TO—THE CLOSER YOU GET TO THE ACTUAL ELECTORAL POOL OF PEOPLE, I PREFER THAT; BUT EXPERTS USE POPULATION DATA ALL THE TIME, AND THOSE I HAD IN—AT TIMES I'VE DONE COMPARISONS OF POPULATION ESTIMATES, VOTING AGE POPULATION ESTIMATES, THOSE BASED ON TURNOUT DATA. FOR EXAMPLE, I DID THAT IN THE RURAL WEST CASE, AND THERE WERE DIFFERENCES OF LESS THAN A PERCENTAGE POINT.

Q. NOW, THE QUESTION OF TURNOUT HAS BEEN RAISED. WAS YOUR METHOD OF ANALYSIS IN THE JUDICIAL CONTEST THE DOUBLE REGRESSION ANALYSIS?

A. IT WAS.

Q. NOW, DOES THE DOUBLE REGRESSION ANALYSIS MAKE IT POSSIBLE TO GENERATE TURNOUT?

A. IT DOES.

Q. CAN YOU JUST TELL ME BRIEFLY HOW THAT WORKS?

A. WELL, YOU GENERATE, YOU GENERATE ESTIMATES OF—YOU BASICALLY DO TWO SETS OF EQUATIONS AND ALGEBRAICALLY COME UP WITH ESTIMATES OF BLACK COHESION AND WHITE CROSSOVER. BY USING PIECES OF THOSE EQUATIONS, YOU CAN GENERATE TURNOUT ESTIMATES. WITH THE SINGLE REGRESSION TECHNIQUE YOU DON'T HAVE THOSE PIECES TO GENERATE THE TURNOUT ESTIMATES. I GUESS IF I WAS TO GET UP TO THE BOARD AND SHOW YOU THE DIFFERENT COMPONENTS OF THE EQUATION, THAT WOULD BE THE WAY TO DO IT; BUT TO VERBALLY DO IT, I THINK IT WOULD TAKE ME A LITTLE TIME.

Q. DR. COLE, HOW CONFIDENT CAN ONE BE IN THESE ESTIMATES THAT YOU GENERATED SHOWING THE PERCENTAGE OF WHITES AND BLACKS VOTING FOR WHITE AND BLACK CANDIDATES?

A. I THINK WE CAN BE VERY CONFIDENT IN THEIR ACCURACY. THERE ARE A VARIETY OF WAYS OF TRYING TO VALIDATE YOUR FINDINGS. YOU CAN, GIVEN THESE ESTIMATES, GENERATE HOW MANY VOTES EACH CANDIDATE WOULD GET AND GO BACK AND SEE HOW WELL IT COMPARES TO WHAT ACTUALLY HAPPENED. VERY OFTEN IT'S VERY CLOSE, WITHIN A FEW PERCENTAGE POINTS OR TWO. YOU CAN USE OTHER TECHNIQUES LIKE HOMOGENEOUS PRECINCT ANALYSIS, COME UP—USING AN ENTIRELY DIFFERENT METHODOLOGY—COME UP WITH ESTIMATES AND SEE HOW WELL THEY COMPARE, AND VERY OFTEN THEY'RE VERY SIMILAR; SO I'M VERY CONFIDENT, AND EXPERTS IN THE FIELD ARE HIGHLY CONFIDENT. THERE ARE DEBATES ABOUT VERY SPECIFIC ASPECTS OF THE STATISTICAL TECHNIQUES, WHAT KIND OF CONFIDENCE LIMITS YOU HAVE ON THEM, BUT BY AND LARGE WE HAVE A HIGH LEVEL OF CONFIDENCE IN THEIR ACCURACY.

Q. NOW, DID YOU HAVE OCCASION TO GET THE AVERAGE LEVELS OF BLACKS VOTING FOR BLACK CANDIDATES AND WHITES VOTING FOR WHITE CANDIDATES?

A. I DID.

Q. AND IS THAT CONTAINED ON PAGE 1 OF PLAINTIFF'S EXHIBIT 313?

A. IT IS. IF YOU LOOK AT THE VERY BOTTOM LINE, IF YOU TAKE THE AVERAGE OR THE MEAN OF THE FIVE CONTESTS, YOU COME UP WITH AN AVERAGE BLACK COHESION OF 76 PERCENT; AN AVERAGE LEVEL OF WHITES VOTING FOR WHITES AT 80 PERCENT, OR SAID

ANOTHER WAY 20 PERCENT WHITE CROSSOVER.

Q. DO THOSE LEVELS—DO THOSE PERCENTAGES INDICATE ONE WAY OR ANOTHER WHETHER OR NOT BLACKS ARE POLITICALLY COHESIVE IN THOSE JUDICIAL CONTESTS?

A. THEY DO. IN HEAD–TO–HEAD CONTESTS, PROBABLY THE MOST COMMON DEFINITION WOULD BE THAT A MAJORITY OF BLACKS OR AFRICAN–AMERICANS VOTE FOR THE AFRICAN–AMERICAN CANDIDATE. SEVENTY-SIX IS OBVIOUSLY GREATER THAN 50 PERCENT, AND IN THIS SITUATION INDICATES, I WOULD SAY, A SUBSTANTIAL DEGREE OF BLACK COHESION.

Q. BUT WHAT ABOUT THE WHITE COHESION, WHAT DOES THAT PERCENT SAY, IF ANYTHING, ABOUT WHETHER WHITES ARE VOTING AS A BLOC?

A. WELL, A 20 PERCENT CROSSOVER RATE IS A SUBSTANTIAL INDICATION OF, OF LACK OF WHITE SUPPORT FOR AFRICAN–AMERICAN CANDIDATES. I BELIEVE IN GINGLES THEIR AVERAGE WHITE CROSSOVER WAS CLOSE TO 32 PERCENT. HERE WE HAVE AN AVERAGE OF 20 PERCENT. WHITE CROSSOVER IN GINGLES WAS ONE AND A HALF TIMES GREATER THAN IT IS HERE IN HAMILTON COUNTY IN THESE JUDICIAL CONTESTS.

Q. DOES THIS ANALYSIS INDICATE THAT VOTING IS RACIALLY POLARIZED IN HAMILTON COUNTY OR NOT?

A. IT DOES TO ME.

Q. WELL, WHAT—DO YOU HAVE A DEFINITION OF RACIAL BLOC VOTING, DR. COLE?

A. IN HEAD–TO–HEAD CONTESTS MY DEFINITION AND THE DEFINITION USED IN GINGLES IS THAT WHITE AND AFRICAN–AMERICAN VOTERS VOTE DIFFERENTLY.

Q. AND DOES THE ANALYSIS HERE MEET THAT DEFINITION OR NOT?

A. IT DOES.

Q. NOW, LET ME ASK YOU ABOUT SOME SPECIFIC ELECTIONS. THE 1979 CITY JUDGESHIP INVOLVING TIMBERLAKE, THE AFRICAN–AMERICAN CANDIDATE, IS IT CORRECT THAT HE GOT ONLY 11 PERCENT OF THE BLACK VOTE?

A. THAT'S CORRECT.

Q. WELL, IS THAT FINDING OF YOURS CONSISTENT WITH YOUR PRIOR TESTIMONY THAT BLACKS ARE POLITICALLY COHESIVE?

A. WELL, IN, IN FOUR OUT OF THESE FIVE CONTESTS YOU HAVE THE SITUATION WHERE A MAJORITY OF AFRICAN–AMERICANS VOTED FOR THE AFRICAN–AMERICAN CANDIDATE AND WHITE CROSSOVER WAS LESS THAN 0 PERCENT. I BELIEVE IN THIS CONTEST TIMBERLAKE JUST WASN'T SUPPORTED BY, BY EITHER COMMUNITY. THIS WOULD BE AN ELECTION WHICH I BELIEVE DOES NOT INDICATE RACIALLY POLARIZED VOTING.

Q. IN DOING A POLARIZED VOTING ANALYSIS AS A STATISTICIAN, DO YOU FOCUS ON ONE OR TWO ELECTIONS OR WOULD YOU FOCUS ON THE UNIVERSE OF ELECTIONS OR WHAT, WHAT'S THE MOST RELEVANT APPROACH IN YOUR VIEW?

A. FIRST OF ALL, MOST RELEVANT FOR ME ARE WHITE/BLACK CONTESTS; AND I LIKE TO LOOK AT CONTESTS THAT ARE CLOSEST TO THE ELECTORAL MECHANISM THAT'S BEING CHALLENGED. FOR ME IT'S CRUCIAL TO LOOK AT COUNTYWIDE CONTESTS AND IF POSSIBLE JUDICIAL CONTESTS?

Q. IN LOOKING AT THE JUDICIAL CONTESTS, WHAT'S MORE RELEVANT IN YOUR VIEW, THE AGGREGATE DATA THAT YOU HAVE AT THE BOTTOM OF YOUR TABLE OR ANY ONE PARTICULAR ELECTION?

A. WELL, IN THIS GROUP OF FIVE CONTESTS, THERE'S ONLY ONE CONTEST THAT TAKES INTO AC-

COUNT ALL POTENTIAL VOTERS IN THE COUNTY, AND THAT'S THE 1980 SUPREME COURT RACE. THESE OTHER CONTESTS ARE ONLY CITY-WIDE CONTESTS; GRANTED, THERE ARE COUNTY VOTERS THERE, BUT THOSE ARE CITY CONTESTS; SO I WOULD PUT MORE WEIGHT ON THE 1980 SUPREME COURT BROWN RACE.

Q. NOW, IT'S—WOULD YOU TELL ME WHO WON, ACTUALLY WON THE 1969 CITY JUDGE CONTEST INVOLVING JUDGE HARRIS?

A. I BELIEVE HARRIS WON.

Q. AND WHAT ABOUT THE 1991 CITY JUDGE CONTEST INVOLVING JUDGE WILLIAMS?

A. WILLIAMS WON.

Q. WELL, IF BLACKS ARE WINNING, IF BLACKS—WELL, AND THEN TIMBERLAKE LOST IN '79 FOR CITY JUDGESHIP, IS THAT CORRECT?

A. CORRECT.

Q. AND THE MCCLARTY AND TIMBERLAKE RAN UNSUCCESSFULLY IN '82, IS THAT CORRECT?

A. RIGHT.

Q. WELL, IF BLACKS HAVE RUN TWICE IN THOSE CITY CONTESTS, DOESN'T THAT MEAN THAT BLACKS ARE USUALLY ABLE TO ELECT A CANDIDATE OF THEIR CHOICE?

A. I DON'T THINK YOU CAN MAKE THAT SORT OF JUDGMENT. THESE ARE CITY CONTESTS. I BELIEVE THE VOTING AGE POPULATION IN 1990 IN THE CITY IS 36 PERCENT. I BELIEVE IN 1990 THE VOTING AGE POPULATION IN THE—COUNTYWIDE IS 17 PERCENT; SO TO MAKE A JUDGMENT THAT, THAT—LOOKING AT THESE CITY ELECTIONS THAT AN AFRICAN-AMERICAN COULD WIN COUNTYWIDE IS INAPPROPRIATE.

MR. CATALANO: YOUR HONOR, THE WITNESS IS BEGINNING TO GET INTO WHAT I WOULD CONSIDER TESTIMONY OF A POLITICAL SCIENTIST. I MEAN, WE HAVE NO OBJECTIONS ABOUT HIS TESTIFYING ABOUT WHAT THE STATISTICS ARE AND SO FORTH, BUT HE'S NOW GETTING INTO MAKING JUDGMENT CALLS OF VOTER BEHAVIOR IN CITYWIDE NON–PARTISAN ELECTIONS VERSUS COUNTYWIDE PARTISAN ELECTIONS; AND THEY HAVE PUT ON—ESTABLISHED NO EXPERTISE IN THE FIELD OF POLITICAL SCIENCE, AND WE WOULD OBJECT TO THAT SORT OF TESTIMONY.

THE COURT: WELL, WHAT DO YOU SAY ABOUT THAT?

MR. MCDONALD: WELL, THIS IS JUST A NUMBERS QUESTION THAT I'M ASKING HIM.

THE COURT: I KNOW IT IS. I DON'T KNOW IF YOU NEED TO PROVE IT ANYWAY, MORE PEOPLE VOTING IN THE HAMILTON COUNTY RACES THAN IN THE CITY. THE ONLY PEOPLE VOTE IN THE CITY ARE THE CITY PEOPLE, IS THAT RIGHT, WHERE THE POPULATION OF THE BLACK COMMUNITY IS, PERCENTAGE WISE IS GREATER IN, IN THE CITY AND BY CONTRAST IS LESSER IN THE COUNTY, IS THAT THE POINT YOU WERE—

MR. MCDONALD: YES, SIR.

THE COURT: WELL, I'LL SUSTAIN HIS OBJECTION, AND WE'VE GOT THAT INFORMATION IN.

MR. MCDONALD: OKAY. ALL RIGHT, YOUR HONOR. THANK YOU.

BY MR. MCDONALD:

Q. NOW, BASED ON YOUR ANALYSIS AND YOUR TESTIMONY IN OTHER VOTE DILUTION CASES, ARE YOU ABLE TO QUANTIFY THE LEVEL OF RACIAL BLOC VOTING IN THESE JUDICIAL CONTESTS THAT YOU ANALYZED?

A. THERE ARE A VARIETY OF GUIDELINES THAT EXPERTS USE IN THE FIELD. I THINK WHEN YOU GET TO LEVELS LIKE THIS, EXPERTS WOULD CALL IT OVER-

WHELMING OR A SUBSTANTIAL AMOUNT OF RACIAL BLOC VOTING. I THINK ONE EXPERT USES A FIGURE IF YOU WERE TO ADD UP BOTH BLACK COHESION AND THE PERCENTAGE OF WHITES VOTING FOR WHITES AND IF IT WAS 160 OR GREATER IT WOULD BE CALLED EXTREME. WE'RE VERY CLOSE TO THAT CRITERION HERE.

Q. NOW, LET'S ASSUME COHESION FOR BLACKS WAS AT THE AVERAGE RATE THAT YOU CALCULATED IN THESE JUDICIAL CONTESTS ABOUT 6 PERCENT, IS THAT CORRECT?

A. CORRECT.

Q. AND LET'S ASSUME THAT THE WHITE CROSSOVER WAS AT THE LEVEL YOU COMPUTED IN PLAINTIFF'S EXHIBIT 313 IN THESE JUDICIAL CONTESTS, THAT IS ABOUT 20 PERCENT IN A COUNTY–WIDE CONTEST; JUST BASED ON THOSE NUMBERS NOW, ASSUMING EQUAL LEVELS OF WHITE AND BLACK TURNOUT, WOULD A BLACK CANDIDATE WIN IN A BLACK/WHITE JUDICIAL CONTEST?

THE COURT: WAIT, WE'VE GOT AN OBJECTION.

MR. CATALANO: WE'RE GOING TO OBJECT TO THAT QUESTION. THAT'S ASKING FOR AN OPINION OF A POLITICAL SCIENTIST TO EXTRAPOLATE A, A, AN ELECTION FROM A CITYWIDE BASIS TO A COUNTY-WIDE BASIS; AND ONCE AGAIN WE WOULD SAY THAT HE HAS NO EXPERTISE IN THAT AREA AND WOULD OBJECT TO HIS—ANY TESTIMONY WITH REGARD TO THAT.

THE COURT: OVERRULED. IT'S NOT A JURY CASE, SO OVERRULED. I'LL LET HIM SAY. YOU MAY ANSWER THE QUESTION.

THE WITNESS: THANK YOU. IT'S A VERY STRAIGHT–FORWARD CALCULATION. WE KNOW THAT COUNTYWIDE VOTING AGE POPULATION IS 17 PERCENT. YOU MULTIPLY THE 17 BY THE BLACK COHESION, ADD THAT FIGURE TO THE 83 PERCENT OF THE VOTERS WHO ARE WHITE TIMES THE 20 PERCENT SUPPORT THAT THEY WOULD GET, YOU'D COME UP WITH A FIGURE THAT WOULD BE FAR LESS THAN WOULD BE NEEDED FOR AN AFRICAN–AMERICAN TO SUCCEED COUNTYWIDE.

BY MR. MCDONALD:

Q. OKAY. NOW, LET'S ASSUME FURTHER THAT THE BLACK COHESION WAS AT THE RATE OF 100 PERCENT, NOT 76 PERCENT, AND THAT THE AVERAGE WHITE CROSSOVER WAS 20 PERCENT; AND ASSUMING EQUAL LEVELS OF BLACK AND WHITE TURNOUT, WOULD THE BLACK CANDIDATE GET THE MAJORITY OF VOTES IN A BLACK/WHITE CONTEST?

A. NOT AT ALL. I THINK, I THINK GIVEN THOSE ASSUMPTIONS, YOU'D COME UP WITH A FIGURE LESS THAN 30 PERCENT.

Q. NOW, HAVE YOU DONE TURNOUT ESTIMATES FOR ANY COUNTYWIDE CONTESTS?

A. I HAVE.

Q. AND LET ME DIRECT YOUR ATTENTION TO PAGES 19 THROUGH 22 OF PLAINTIFFS' EXHIBIT 313. IS YOUR TURNOUT ANALYSIS CONTAINED ON THOSE PAGES?

A. IT IS.

THE COURT: LET ME GET CAUGHT UP WITH YOU THERE.

—WHERE ARE THESE PAGES, WHERE ARE THESE NUMBERS?

MR. MCDONALD: THIS IS THE LAST PART OF THE EXHIBIT, YOUR HONOR, THE LAST FOUR PAGES.

THE COURT: ALL RIGHT.

THE CLERK: IT STARTS ON THE FOURTH PAGE, FOURTH PAGE FROM THE BACK?

MR. MCDONALD: THAT'S CORRECT.

Q. NOW, WERE YOU ABLE TO GENERATE TURNOUT ESTIMATES FOR ANY COUNTYWIDE CONTESTS?

A. I WAS.

Q. AND IDENTIFY THOSE FOR ME, IF YOU WILL.

A. WELL, ON THE FIRST PAGE OF THESE TURNOUT ESTIMATES, THE 1974 DEMOCRATIC PRIMARY ON MAY 3RD, THE REGISTRAR RACE WAS A COUNTYWIDE RACE. THE AFRICAN–AMERICAN CANDIDATE WAS MAPP, AND THE TURNOUT ESTIMATES IN THAT PARTICULAR CONTEST WERE 10 PERCENT OF THE POPULATION FIGURES FOR AFRICAN–AMERICANS AND WHITES.

Q. AND WHAT FOR WHITES?

A. BOTH 10 PERCENT FOR AFRICAN–AMERICANS AND 10 PERCENT FOR WHITES.

Q. OKAY, AND WHAT WAS THE OTHER ELECTIONS THAT YOU LOOKED AT?

A. ON THE NEXT PAGE THE VERY BOTTOM LINE, THE 1990 DEMOCRATIC PRIMARY MAY 1ST, GARTH'S PUBLIC DEFENDER CONTEST, THE TURNOUT WAS 14 PERCENT OF THE VOTING AGE POPULATION AND 9 PERCENT—THAT WAS 14 PERCENT OF THE AFRICAN–AMERICAN VOTING AGE POPULATION AND 9 PERCENT OF THE WHITE VOTING AGE POPULATION.

Q. ALL RIGHT. WHAT ABOUT THE 1990 GENERAL ELECTION?

A. THAT'S ON THE NEXT TO LAST PAGE OF THE EXHIBIT, THAT WOULD BE GARTH'S GENERAL ELECTION ON AUGUST 2ND, AND IN THAT PARTICULAR CONTEST AFRICAN–AMERICANS TURNED OUT AT 10 PERCENT OF THE VOTING AGE POPULATION AND 15 PERCENT OF THE WHITES TURNED OUT. IT WAS 10 PERCENT OF AFRICAN–AMERICANS AND 15 PERCENT OF WHITES.

Q. AND DID YOU LOOK AT ANY OTHER COUNTYWIDE CONTESTS TO DETERMINE TURNOUT? WHAT ABOUT THE 1990 DEMOCRATIC PRIMARY INVOLVING SWAFFORD?

A. YES, I THINK THAT WAS THE LAST ONE. THERE THE FIGURES ARE 19 PERCENT AFRICAN–AMERICAN TURNOUT AND 8 PERCENT WHITE TURNOUT.

Q. NOW, DID YOU DO AN AVERAGE TURNOUT RATE FOR THOSE COUNTYWIDE CONTESTS?

A. I DID.

Q. AND WHAT WERE THE AVERAGE TURNOUT RATES FOR BLACKS AND WHITES?

A. IT WAS 13 PERCENT FOR AFRICAN–AMERICANS AND 11 PERCENT FOR WHITES.

Q. NOW, IF WE APPLY—WERE THOSE ALL THE COUNTYWIDE CONTESTS FOR WHICH TURNOUT COULD BE GENERATED?

A. THAT'S CORRECT.

Q. NOW, APPLYING THOSE AVERAGES TO THE PERCENTAGE OF BLACK AND WHITE CROSSOVER VOTES THAT JUDGE WILLIAMS GOT IN HIS 1991 CITY ELECTION, WOULD HE HAVE WON COUNTYWIDE?

A. NO, HE WOULD NOT HAVE.

Q. WHAT PERCENT OF THE VOTES WOULD HE HAVE GOTTEN?

A. IF YOU DO THOSE CALCULATIONS WITHOUT TAKING TURNOUT INTO, INTO ACCOUNT, HE WOULD HAVE GOTTEN COUNTYWIDE PERCENT OF THE VOTE. IF YOU TAKE INTO ACCOUNT THE—THESE TURNOUT FIGURES, HE WOULD HAVE GOTTEN SOMETHING LIKE 29 PERCENT.

Q. NOW, NOW, I'M ASKING YOU A QUESTION NOT BASED ON YOUR KNOWLEDGE AS A POLITICAL SCIENTIST BECAUSE YOU HAVEN'T BEEN QUALIFIED AS THAT, BUT SIMPLY AS A STATISTICIAN, AS A PERSON WHO ANALYZES VOTER BEHAVIORS STATISTICALLY, BASED ON YOUR STATISTICAL ANALYSIS DO YOU HAVE A JUDGMENT WHETHER BLACK VOTERS GIVEN THE PATTERNS OF RACIAL BLOC VOTING THAT YOU'VE

[TR. 95–108].

In regard to the election of Ardena Garth, the one black candidate who has been elected in a county wide election, Dr. Cole testified as follows:

Q. OKAY. LET'S LOOK AT THE 1990 DEMOCRATIC PRIMARY. IS THAT THE NEXT CONTEST THAT YOU LOOKED AT?

A. IT IS.

Q. AND WHAT PERCENT OF THE BLACK VOTE DID GARTH GET?

A. GARTH GOT 91 PERCENT OF THE BLACK VOTE.

Q. AND WHAT PERCENT OF THE WHITE CROSSOVER VOTE DID SHE GET?

A. 38 PERCENT.

Q. OF ALL THE CONTESTS THAT YOU'VE ANALYZED SO FAR, IS THAT THE GREATEST PERCENT OF WHITE CROSSOVER VOTE THAT A BLACK CANDIDATE RECEIVED?

A. I BELIEVE SO, I BELIEVE SO.

Q. DO YOU HAVE ANY INFORMATION THAT LEADS YOU TO ACCOUNT FOR THE HIGHER PERCENT OF WHITE CROSSOVER VOTE IN THAT CONTEST?

A. WELL, I KNOW THAT SHE WAS APPOINTED BY THE GOVERNOR, I KNOW SHE WAS AN INCUMBENT.

MR. CATALANO: YOUR HONOR, ONCE AGAIN WE'D OBJECT. HE'S ASKING QUESTIONS DEALING WITH SPECIAL CIRCUMSTANCES.

THE COURT: HE PROBABLY IS. I GUESS THAT'S A QUESTION FOR THE COURT TO DECIDE ONCE I GATHER ALL THE FACTS TOGETHER, SO SUSTAINED.

BY MR. MCDONALD:

Q. ALL RIGHT, SIR. LET'S LOOK AT THE NEXT CONTEST THAT YOU EXAMINED, THE ONE INVOLVING JUVENILE COURT CLERK, IS THAT CORRECT?

A. THAT'S CORRECT.

Q. AND WHAT PERCENT OF THE BLACK VOTE DID SWAFFORD GET?

A. SWAFFORD GOT 74 PERCENT OF THE BLACK VOTE.

Q. AND WHAT PERCENT OF THE WHITE VOTE?

A. 6 PERCENT.

Q. AND HE WON OR LOST?

A. HE LOST.

Q. WHAT KIND OF A STATISTICAL ANALYSIS DID YOU USE IN THAT ANALYSIS?

A. THAT WAS ECOLOGICAL REGRESSION.

Q. AND THE SAME WAS TRUE OF THE GARTH CONTEST?

A. THAT'S CORRECT.

Q. ALL RIGHT, AND LET'S LOOK AT THE LAST CONTEST COUNTY–WIDE THAT YOU ANALYZED, THAT WOULD HAVE INVOLVED GARTH, IS THAT CORRECT?

A. CORRECT.

Q. WHAT PERCENT OF THE BLACK VOTE DID YOU ESTIMATE SHE GOT?

A. SHE GOT ALL OF IT.

Q. AND WHAT PERCENTAGE OF THE WHITE VOTE DID YOU ESTIMATE SHE GOT?

A. 48 PERCENT.

Q. NOW, DID YOU HAVE OCCASION TO DO AN AVERAGE LEVEL OF COHESION BY BLACKS AND AN AVERAGE LEVEL OF CROSSOVER VOTING BY WHITES IN THOSE COUNTYWIDE CONTESTS?

A. I DID. I DID IT BY—I DID SUCH A CALCULATION IN THE HEAD–TO–HEAD CONTESTS.

Q. SO YOU HAD TO EXCLUDE SOME OF THE CONTESTS IN DETERMINING THE AVERAGE LEVELS OF CROSSOVER VOTING AND COHESION?

A. THAT'S CORRECT.

Q. AND WHY IS THAT?

A. THOSE ARE MULTI–CANDIDATE CONTESTS WHERE THERE WERE NON–NUMBERED POSTS; THAT IS PEOPLE COULD VOTE FOR AS MANY AS FOUR CANDIDATES, UNDER-

STAND THOSE ESTIMATES ARE NOT CONSISTENT WITH THE KIND OF ESTIMATES YOU'D GET WITH A HEAD–TO–HEAD CONTEST, SO IT WOULD MISLEAD YOU AS TO AVERAGE LEVEL OF COHESION OR WHITE CROSSOVER.

Q. NOW, DID YOU COMPUTE THE AVERAGE LEVEL OF WHITE CROSSOVER VOTING EXCLUDING THE CANDIDACY OF GARTH?

A. YES, I DID THEM BOTH WAYS.

Q. AND WHAT WERE THE FIGURES THAT YOU CAME UP WITH?

A. WELL, FOR, FOR WHITE CROSSOVER, INCLUDING BOTH THE DEMOCRATIC PRIMARY AND GENERAL ELECTION OF GARTH, THE WHITE CROSSOVER ON THE AVERAGE WAS 23 PERCENT. IF YOU EXCLUDED BOTH GARTH CONTESTS, THE WHITE CROSSOVER WOULD BE 10 PERCENT.

Q. NOW, HAS ANY—TO YOUR KNOWLEDGE HAS ANY BLACK CANDIDATE EVER WON AN AT–LARGE COUNTYWIDE CONTEST IN HAMILTON COUNTY?

A. I THINK GARTH IS THE ONLY ONE.

Q. OKAY. NOW, OF THE EIGHT CONTESTS THAT YOU EXAMINED, INCLUDING THOSE INVOLVING GARTH, IN HOW MANY OF THEM DID YOU FIND RACIAL BLOC VOTING?

A. SEVEN OUT OF THE EIGHT.

Q. AND IN HOW MANY OF THOSE CONTESTS WAS THE BLACK CANDIDATE SUCCESSFUL?

A. TWICE.

Q. AND THAT BLACK CANDIDATE OR CANDIDATES WAS WHOM OR WERE WHOM?

A. GARTH.

Q. SHE ACCOUNTED FOR BOTH OF THOSE WINS?

A. THAT'S CORRECT.

Q. NOW, GIVEN THE FACT THAT GARTH WON, WHY ISN'T THAT SIMPLY DISPOSITIVE FROM A STATISTICAL POINT OF VIEW OF THE CONTENTION THAT BLACKS CAN'T WIN AT–LARGE?

A. IF YOU, IF YOU LOOK AT THE—FIRST OF ALL, THERE'S ANOTHER NUMBER HERE THAT I THINK SHOULD BE INCLUDED BEFORE I COMMENT; AND THERE WERE SEVEN CONTESTS THAT WERE EVIDENCED BY RACIAL BLOC VOTING. OF THOSE SEVEN, FIVE, FIVE TIMES AFRICAN–AMERICAN CANDIDATES LOST THROUGH RACIAL BLOC VOTING AND MINORITY VOTE DILUTION. GIVEN THE LEVELS OF WHITE CROSSOVER, I WOULD THINK THAT GIVEN THE AVERAGE LEVELS OF CROSSOVER, I THINK IT WOULD BE VERY DIFFICULT FOR, FOR AN AFRICAN–AMERICAN TO WIN COUNTYWIDE. IT'S NOT IMPOSSIBLE, AS EVIDENCED BY GARTH, BUT I THINK IT WOULD BE EXTREMELY DIFFICULT GIVEN AVERAGE LEVELS OF CROSSOVER.

Q. WELL, WHAT'S THE RELEVANCE OF LOOKING AT THE AVERAGE LEVEL OF CROSSOVER VOTING FROM A STATISTICAL POINT OF VIEW?

A. WELL, YOU'RE LOOKING AT A WIDER RANGE OF ELECTIONS, BOTH IN TERMS OF NUMBER OF ELECTIONS AND OVER TIME.

Q. IN YOUR JUDGMENT WOULD IT BE RELIABLE TO FOCUS JUST ON THE GARTH CONTEST IN DETERMINING WHETHER OR NOT THERE WAS RACIAL BLOC VOTING?

A. I THINK IT WOULD BE MORE RELIABLE TO LOOK AT A WIDER POOL OF ELECTIONS.

[TR 119–124].

The Court specifically **FINDS** that the Garth election is not a reliable measure of racial bloc voting.

In addition, the Court takes judicial notice of racially polarized voting in Hamilton

County as set in the following charts which are Appendixes A, B, and C to *Brown v.* *Board of Com'rs of Chattanooga, Tenn.*, 722 F.Supp. 380, 400–406 (E.D.Tenn.1989):

APPENDIX A
Chattanooga City Commission
Election Contests
1971–1987

1971

|  | Estimated % of Vote For | | | |
|---|---|---|---|---|
| Office/Candidate | % of Vote For | White | Black | Polarization |
| PRIMARIES— | | | | |
| MAYOR: | | | | |
| Brown | 1.4 | 1.1 | 2.1 | |
| Crawford | 34.8 | 27.4 | 47.9 | Racially |
| Days (black) | 3.1 | −0.5 | 9.4 | Polarized |
| Walker | 57.7 | 71.7 | 32.4 | |
| Wright (black) | 3.2 | 0.3 | 8.3 | |
| | | | | |
| FIRE & POLICE COMMISSIONER: | | | | |
| Kilgore | 0.3 | 0.0 | 0.9 | |
| Mansfield | 9.7 | 12.5 | 4.1 | Racially |
| Roberts | 47.8 | 68.7 | 7.9 | Polarized |
| Shell | 0.5 | 0.1 | 1.2 | |
| Turner | 41.7 | 18.8 | 85.9 | |
| | | | | |
| PUBLIC WORKS COMMISSIONER: | | | | |
| Carter (black) | 1.8 | 1.3 | 3.2 | |
| Key (black) | 21.9 | 1.9 | 63.0 | Racially |
| Rose | 70.1 | 89.7 | 32.2 | Polarized |
| Snow | 6.3 | 8.8 | 3.3 | |
| | | | | |
| PUBLIC UTILITIES COMMISSIONER: | | | | |
| Alexander (black) | 4.6 | 0.1 | 13.2 | |
| Conrad | 53.6 | 47.5 | 61.5 | Racially |
| Davis (black) | 4.1 | −0.2 | 14.9 | Polarized |
| Morgan | 16.6 | 23.9 | 3.3 | |
| Roth | 21.0 | 28.7 | 7.0 | |
| | | | | |
| EDUCATION & HEALTH COMMISSIONER: | | | | |
| Franklin (black) | 49.0 | 20.9 | 94.6 | |
| McAuley | 4.7 | 7.3 | 1.0 | Racially |
| Petersen | 46.3 | 71.8 | 4.3 | Polarized |
| | | | | |
| RUN–OFFS— | | | | |
| FIRE & POLICE COMMISSIONER: | | | | |
| Roberts | 52.4 | 74.5 | 5.5 | Racially |
| Turner | 47.6 | 25.5 | 94.5 | Polarized |
| | | | | |
| EDUCATION & HEALTH COMMISSIONER: | | | | |
| Franklin (black) | 52.8 | 27.1 | 98.9 | Racially |
| Peterson | 47.2 | 72.9 | 1.1 | Polarized |

1975

| | | | | |
|---|---|---|---|---|
| PRIMARIES— | | | | |
| MAYOR: | | | | |
| Brown | 0.7 | 0.7 | 0.6 | |
| Conrad | 26.7 | 20.5 | 38.9 | Racially |
| Copeland | 4.3 | 6.1 | −0.3 | Polarized |
| Rose | 40.3 | 48.7 | 8.0 | |
| Turner | 28.0 | 24.0 | 52.7 | |
| | | | | |
| FIRE & POLICE COMMISSIONER: | | | | |
| Crabtree | 1.3 | 1.3 | 2.2 | |

| Office/Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| King | 0.3 | 0.2 | 0.9 | Not |
| Lewis (black) | 0.2 | 0.2 | 0.5 | Racially |
| Mansfield | 32.3 | 34.4 | 38.0 | Polarized |
| Poole | 1.2 | 1.2 | 1.2 | |
| Roberts | 64.6 | 62.7 | 57.1 | |

PUBLIC WORKS COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Clark | 22.0 | 23.4 | 15.8 | |
| DeFriese | 18.1 | 17.9 | 20.7 | Not |
| Dickerson | 16.7 | 16.1 | 15.1 | Racially |
| Moore (black) | 4.7 | 2.3 | 12.2 | Polarized |
| Olgiati | 38.6 | 40.4 | 36.3 | |

PUBLIC UTILITIES COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Burnette | 2.5 | 2.8 | 2.5 | |
| B. Davis | 27.5 | 24.4 | 37.5 | |
| G. Davis (black) | 4.0 | −0.1 | 17.7 | |
| Eberle | 23.4 | 27.5 | 4.3 | Racially |
| Keene | 6.8 | 6.8 | 4.2 | Polarized |
| McDonald | 20.4 | 22.6 | 11.7 | |
| Milles | 7.3 | 6.7 | 5.5 | |
| Samples | 8.2 | 9.5 | 14.5 | |

EDUCATION & HEALTH COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Berry | 32.9 | 47.8 | 0 | Racially |
| Franklin (black) | 67.1 | 52.2 | 100 | Polarized |

RUN-OFFS—
MAYOR:

| | | | | |
|---|---|---|---|---|
| Rose | 70.9 | 78.2 | 31.4 | Racially |
| Turner | 29.1 | 21.8 | 68.6 | Polarized |

PUBLIC WORKS COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Clark | 60.3 | 60.1 | 59.3 | Not Racially |
| Olgiati | 39.7 | 39.9 | 40.7 | Polarized |

PUBLIC UTILITIES COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Davis | 47.2 | 39.6 | 78.2 | Racially |
| Eberle | 52.8 | 60.4 | 21.8 | Polarized |

1979

PRIMARIES—
MAYOR:
Rose (unopposed)

FIRE & POLICE COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Dean | 9.6 | 8.2 | 16.2 | |
| Martin | 17.4 | 16.7 | 20.5 | Racially |
| Smart | 48.7 | 55.1 | 23.6 | Polarized |
| Williams | 24.2 | 19.9 | 39.6 | |

PUBLIC WORKS COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Adams | 25.2 | 36.0 | 4.7 | |
| Clark | 48.8 | 57.8 | 17.4 | Racially |
| Hyde | 5.2 | 5.7 | 4.3 | Polarized |
| Wright (black) | 20.8 | 0.5 | 73.6 | |

PUBLIC UTILITIES COMMISSIONER:

| | | | | |
|---|---|---|---|---|
| Donohoe | 21.1 | 22.1 | 24.0 | Not Racially |
| Eberle | 78.9 | 77.9 | 76.0 | Polarized |

EDUCATION & HEALTH COMMISSIONER:
Franklin (black) (unopposed)

| Office/Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| **RUN–OFFS—** | | | | |
| **FIRE & POLICE COMMISSIONER:** | | | | |
| Smart | 63.5 | 68.5 | 39.2 | Racially |
| Williams | 36.5 | 31.5 | 60.8 | Polarized |
| | | | | |
| **PUBLIC WORKS COMMISSIONER:** | | | | |
| Adams | 40.8 | 39.9 | 50.2 | Racially |
| Clark | 59.2 | 60.1 | 49.8 | Polarized |

### 1983

| Office/Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| **PRIMARIES—** | | | | |
| **MAYOR:** | | | | |
| Baty | 2.0 | 1.8 | 2.9 | |
| Boehm | 12.8 | 12.7 | 13.1 | Not |
| Fuller | 25.6 | 21.3 | 36.9 | Racially |
| Roberts | 55.8 | 61.2 | 41.4 | Polarized |
| Spradley | 2.5 | 2.2 | 2.8 | |
| Whitener | 1.3 | 0.8 | 2.9 | |
| | | | | |
| **FIRE & POLICE COMMISSIONER:** | | | | |
| Hisey | 25.9 | 21.5 | 37.5 | |
| Kennedy | 33.2 | 40.4 | 11.8 | |
| Knowles | 21.2 | 17.8 | 33.3 | Racially |
| Meeks | 15.1 | 15.8 | 14.2 | Polarized |
| Townson | 4.6 | 4.5 | 3.3 | |
| | | | | |
| **PUBLIC WORKS COMMISSIONER:** | | | | |
| Broick | 3.5 | 3.2 | 4.7 | |
| Clark | 52.1 | 50.3 | 55.0 | Not |
| Davis | 36.7 | 37.0 | 37.2 | Racially |
| Hill | 3.0 | 3.5 | 1.4 | Polarized |
| Hipple | 0.5 | 0.6 | 0.5 | |
| Igou | 4.2 | 5.3 | 1.2 | |
| | | | | |
| **PUBLIC UTILITIES COMMISSIONER:** | | | | |
| Cannon | 23.7 | 24.2 | 22.3 | |
| Conrad | 34.5 | 27.7 | 54.3 | Racially |
| Eberle | 41.8 | 48.0 | 23.4 | Polarized |
| | | | | |
| **EDUCATION & HEALTH COMMISSIONER:** | | | | |
| Franklin (black) | 71.1 | 59.4 | 99.2 | Racially |
| Williams | 28.9 | 40.6 | 0.8 | Polarized |
| | | | | |
| **RUN–OFFS—** | | | | |
| **FIRE & POLICE COMMISSIONER:** | | | | |
| Hisey | | * 23.72 | 79.51 | Racially |
| Kennedy | | 76.28 | 20.49 | Polarized |
| | | | | |
| **PUBLIC UTILITIES COMMISSIONER:** | | | | |
| Conrad | | * 30.59 | 71.73 | Racially |
| Eberle | | 69.41 | 28.27 | Polarized |

### 1987

| Office/Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| **PRIMARIES—** | | | | |
| **MAYOR:** | | | | |
| Eberle | 37.0 | 39.1 | 32.0 | Not |
| Roberts | 57.9 | 59.6 | 52.7 | Racially |
| Sandefur (black) | 5.2 | 1.3 | 15.3 | Polarized |
| | | | | |
| **FIRE & POLICE COMMISSIONER:** | | | | |
| Davis | 45.4 | 34.4 | 74.4 | |
| Kennedy | 48.1 | 64.0 | 6.0 | Racially |

| Office/Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| Wright (black) | 6.5 | 1.6 | 19.6 | Polarized |
| **PUBLIC WORKS COMMISSIONER:** | | | | |
| Clark | | * 51.67 | 37.42 | |
| Cramer | | 2.65 | 2.69 | Racially |
| Littlefield | | 44.43 | 58.36 | Polarized |
| Whitener | | 1.24 | 1.53 | |
| **PUBLIC UTILITIES COMMISSIONER:** | | | | |
| Freeman (black) | 37.3 | 14.8 | 94.5 | |
| Rose | 54.9 | 74.3 | 4.7 | Racially |
| Barzour | 7.8 | 10.9 | 0.8 | Polarized |
| **EDUCATION & HEALTH COMMISSIONER:** | | | | |
| Franklin (black) | 79.3 | 71.4 | 97.0 | Not |
| Heathington (black) | 6.3 | 8.2 | 2.7 | Racially |
| Martino | 14.4 | 20.4 | 0.4 | Polarized |
| **RUN–OFFS—** | | | | |
| **FIRE & POLICE COMMISSIONER:** | | | | |
| Davis | 49.9 | 31.4 | 96.7 | Racially |
| Kennedy | 50.1 | 68.6 | 3.3 | Polarized |
| **PUBLIC WORKS COMMISSIONER:** | | | | |
| Clark | 44.4 | 51.2 | 28.5 | Racially |
| Littlefield | 55.6 | 48.8 | 71.5 | Polarized |

---

## APPENDIX B
### Chattanooga City Judge
### Election Contests
### 1969–1987

**1969**

| Candidate | % of Vote For | Estimated % of Vote For White | Black | Polarization |
|---|---|---|---|---|
| Harris (black) | 61.4 | 30.7 | 96.2 | Racially |
| Hudson | 38.6 | 69.3 | 3.8 | Polarized |

**1971**

| | | | | |
|---|---|---|---|---|
| Hargraves | 6.1 | 6.6 | 6.6 | |
| Meyer | 28.5 | 15.0 | 56.3 | Racially |
| O'Rear | 14.5 | 13.9 | 15.7 | Polarized |
| Parks | 51.0 | 64.6 | 23.3 | |

**1975**

| | | | | |
|---|---|---|---|---|
| Cash | 33.2 | 30.9 | 49.4 | Racially |
| Meacham | 66.8 | 69.1 | 50.6 | Polarized |

**1978**

| | | | | |
|---|---|---|---|---|
| | | | | Not |
| Meyer | | * 84.73 | 77.29 | Racially |
| Timberlake (black) | | 15.27 | 22.80 | Polarized |

**1979**

| | | | | |
|---|---|---|---|---|
| Meyer | 61.7 | 59.4 | 68.4 | Not |
| Taylor | 32.7 | 37.1 | 20.8 | Racially |
| Timberlake (black) | 5.6 | 3.6 | 10.9 | Polarized |
| Brown | | * 38.58 | 75.53 | Racially |
| Cox | | 61.42 | 24.47 | Polarized |

| Candidate | % of Vote For | Estimated % of Vote For White | Estimated % of Vote For Black | Polarization |
|---|---|---|---|---|
| **1982** | | | | |
| McClarty (black) | 37.4 | 15.2 | 93.4 | Racially |
| Taylor | 56.3 | 76.5 | 5.7 | Polarized |
| Timberlake (black) | 6.3 | 8.3 | 0.9 | |
| **1983** | | | | |
| Brock | 11.4 | 12.0 | 11.1 | |
| | | | | Not |
| Cox | 77.0 | 78.4 | 73.9 | Racially |
| Timberlake (black) | 11.6 | 9.7 | 15.1 | Polarized |

## APPENDIX C
### Other Elections and Referenda

| Election/Candidate | % of Vote For | Estimated % of Vote For White | Estimated % of Vote For Black | Polarization |
|---|---|---|---|---|
| **1970 REFERENDUM ON CONSOLIDATED GOVERNMENT:** | | | | |
| For | 52.2 | 62.4 | 11.1 | Racially |
| Against | 47.8 | 37.6 | 88.9 | Polarized |
| **1978 CONSTITUTIONAL AMENDMENT ON REPEAL OF INTERRACIAL MARRIAGE BAN:** | | | | |
| For | 61.0 | 51.0 | 84.0 | Racially |
| Against | 39.0 | 49.0 | 16.0 | Polarized |
| **1978 REFERENDUM ON ELECTED SCHOOL BOARD:** | | | | |
| Yes | 55.1 | 47.8 | 82.5 | Racially |
| No | 44.9 | 52.2 | 17.5 | Polarized |
| **1980 SUPREME COURT:** | | | | |
| Drowota | 49.0 | 58.4 | 22.3 | |
| Brown (black) | 42.7 | 30.4 | 76.8 | Racially |
| Parrish | 8.3 | 11.2 | 0.9 | Polarized |
| **1984 METRO CHARTER REFERENDUM:** | | | | |
| For | 40.9 | 51.5 | 11.1 | Racially |
| Against | 59.1 | 48.5 | 88.9 | Polarized |
| **1988 CITY CHARTER (voting by districts—mayor/council form of government):** | | | | |
| For | 36.3 | 30.5 | 56.1 | Racially |
| Against | 63.7 | 69.5 | 43.9 | Polarized |

---

The Court finds that these findings in the appendixes to *Brown,* also establish the third *Gingles* precondition that the white majority votes sufficiently as a bloc to usually enable it to defeat the minority's preferred candidate.

Although the majority of these charts were city-wide elections, the Court **FINDS** that these races are instructive in regard to racial bloc voting.

## RESULTS TEST

In addition to *Gingles* ability to elect test, the nature of a Section 2 violation and the proof required to establish a "results test" is further articulated in the Senate Report that accompanied the 1982 amendments to the

Voting Rights Act. Not only does the Senate Report reject the intent test for Section 2 claims, but it also enumerates "typical factors" to help guide the courts in the application of the "results test" as the relevant legal standard. These "typical factors" are set out in *Gingles, supra,* at 36–37, 106 S.Ct. at 2759 as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, antisingle shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

The Court finds that five of these seven Senate factors are applicable to this case, and are in fact supported by the following undisputed facts the majority of which have been filed and stipulated by the parties.

### THE EXTENT OF ANY HISTORY OF OFFICIAL DISCRIMINATION IN THE STATE OR POLITICAL SUBDIVISION THAT TOUCHED THE RIGHT OF THE MEMBERS OF THE MINORITY GROUP TO REGISTER, TO VOTE, OR OTHERWISE TO PARTICIPATE IN THE DEMOCRATIC PROCESS

In 1883 the general assembly enacted a new charter for Chattanooga providing for a system of mandatory voter registration by "age and color," requiring proof of payment of the poll tax as a condition for registration, putting the police force under the control of a commission appointed by the governor, and requiring all city aldermen to be elected at-large but with a ward residency requirement for some aldermen. The purpose of the 1883 charter was to eliminate black office holding. *Brown v. Board of Commissioners of Chattanooga, Tenn.,* 722 F.Supp. 380, 386 (E.D.Tenn.1989).

In 1889 the general assembly enacted a series of laws designed to disfranchise blacks. *Brown, supra* at 386. One of these laws was the "Dortch Law," which required the use of a secret, Australian style ballot. The effect of the law was to impose a literacy test for voting, which had a severe impact on illiterate blacks.

The Dortch Law contained a grandfather clause making it possible for anyone who had voted before 1857 (by definition only whites) to receive assistance with their ballot.

Another law enacted in 1889 was the "Myers Law," which imposed a strict requirement of registration, with racial designation, 20 days prior to each election. The act disfranchised many black voters.

The "Lea Law," also enacted in 1889, provided for separate ballot boxes for state and federal elections. The purpose of the law was to remove state elections and the super-

vision of white voter fraud from federal oversight.

A fourth law reimposed the requirement of proof of payment of the poll tax as a condition for voting, which had been repealed several years earlier. In 1901 the general assembly passed a law forbidding even private institutions from educating blacks and whites together.

In 1905 there was a race riot in Chattanooga after whites enforced a new "Jim Crow law" by ejecting all the blacks from a city street car.

During this period of time there was a hardening of white attitudes towards blacks. There were lynchings of blacks in the city in 1885, 1893, 1894, 1906 and 1909, and a lynching in the county in 1897. *Brown, supra* at 386. In 1911 the general assembly enacted a new charter for Chattanooga eliminating ward voting and establishing a Board of Commissioners system of municipal government consisting of a mayor and four commissioners elected at-large.

In addition to abolishing district voting, the 1911 statute contained two other provisions aimed directly at blacks. One prohibited any candidate for municipal office from paying the poll tax of an elector. Another made it a crime for any person to agree to perform any service for any candidate in consideration of anything of value. *Brown, supra* at 387.

## THE EXTENT TO WHICH VOTING IN THE ELECTIONS OF THE STATE OR POLITICAL SUBDIVISION IS RACIALLY POLARIZED

The political cohesiveness of blacks in Hamilton County is evident from *Brown*, supra, and the racial bloc voting analysis performed by the plaintiffs' expert in this case, Dr. Steven Cole. Dr. Cole used ecological regression analysis, as well as homogeneous precinct analysis, which is another method for determining the existence of racial bloc.

Ecological regression analysis produces, among other things, estimates of the percent of whites and blacks voting for white and black candidates in particular elections. Regression analysis requires one preliminarily to compute the percent of population (or

registered voters or turnout) of each race in each precinct (the horizontal axis), and the percent of the votes for each candidate in each precinct (the vertical axis) for each election analyzed. This data is used as coordinates to plot points on a graph. A line is then drawn which "best fits" the points on the graph. The place at which the line crosses the left vertical axis of the graph can be interpreted as representing the voting pattern in an average precinct with no blacks, while the point at which the line crosses the right vertical axis can be interpreted as representing the voting pattern in an all-black precinct. The "slope of the regression line, or the vertical amount by which the line moves from the left to the right axis, is a measure of how much difference there is in voting patterns between whites and blacks.

Homogeneous precinct analysis, which looks at precincts predominantly (90% or more) of one race, is intuitively easy to understand. If white candidates get most or all, and black candidates get few or no votes in homogeneous white precincts, that is direct evidence that whites in those precincts are voting along racial lines.

In conducting his homogeneous precinct analysis, Dr. Cole took a conservative approach. He assumed that all the votes for black candidates in homogeneous white precincts came from white voters. Thus, his estimates based upon homogeneous precinct analysis show the *minimum* level of white bloc voting that occurred.

Dr. Cole analyzed elections which included county and state elections and recent Chattanooga city elections. Dr. Cole's analysis shows that in elections where voters were presented with a racial choice, voting was demonstrably polarized.

No blacks have run for the Eleventh Judicial Circuit or the Court of General Sessions. However, blacks have run for city court on four occasions, and once for the Supreme Court of Tennessee. Dr. Cole's analysis of these five judicial contests shows that voting is racially polarized. Blacks voted for black candidates at the average rate of 76%, showing that blacks are politically cohesive in black-white judicial elections. Whites voted

for white candidates in judicial elections at the average rate of 80%. Stated differently, the average level of crossover voting by whites was 20%. The level of white crossover voting in judicial elections has been steadily *declining* over time. In the 1969 contest for city judge the black candidate got 30.7% of the white vote. In the 1980 contest for state Supreme Court the black candidate, an incumbent who had been appointed by the governor to fill an unexpired term, got 30.4% of the white vote. In the 1982 contest for city judge the two black candidates got a combined white vote of just 23.5%. In the 1991 contest for city judge the black candidate got only 13% of the white vote.

Based upon the most recent voting patterns the level of racial bloc voting is increasing in Hamilton County making it more difficult than ever for a black to win a county-wide judicial office.

Dr. Cole also analyzed nine county-wide elections from 1966–1990 using either regression analysis (7 elections) or homogeneous precinct analysis (2 elections). Six of the contests were for county offices, *i.e.*, county council, county trustee, public defender, and juvenile court clerk. One of the elections was for the Tennessee Supreme Court, and two were Democratic presidential preference primaries. The average level of cohesion of black voters in the nine county-wide elections was 75%, and the average level of white crossover voting was 17%.

Dr. Cole examined a total of 26 black-white elections from 1966–1993 using regression analysis. In these elections the average rate of black cohesion was 79%. The average level of white crossover voting was 12%. Dr. Cole's aggregate homogeneous precinct analysis confirmed the results of his regression analysis.

The defendants' expert, Dr. Delbert Taebel, agreed that voting in Hamilton County was racially polarized, and that blacks were politically cohesive. However he also testified that the controlling factor in elections in Hamilton County is party membership rather than race. Dr. Taebel did not consider the 1980 contest for the Tennessee State Supreme Court in his analysis, and in fact this contest disproves this conclusion. In this 1980 election, a black Republican incumbent, Brown, who had been appointed by the governor to fill an unexpired term, got 30.4% of the white vote and 76.8% of the black vote for a total of 42.7% of the vote in Hamilton County. Although historically blacks in Hamilton County have voted for the Democratic candidate in this 1980 election, blacks voted for a Republican black candidate, while 69.6% of the white vote went to a white candidate.

In white/white contests a majority of blacks will often vote for the winning white candidate. Although these white candidates are in some sense the choice of black voters, the choice is one which has been a limited choice by the result of various restrictions in the political process.

### THE EXTENT TO WHICH THE STATE OR POLITICAL SUBDIVISION HAS USED UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTISINGLE SHOT PROVISIONS, OR OTHER VOTING PRACTICES OR PROCEDURES THAT MAY ENHANCE THE OPPORTUNITY FOR DISCRIMINATION AGAINST THE MINORITY GROUP

Prior to 1941, the Chattanooga board of education was elected at-large in the same manner as the city commission. No blacks were ever elected to the board under the at-large system.

In 1941, a seven member board of education was created with six appointed members, with the seventh member being the commissioner of education. Citizens in the community were dissatisfied with the appointed board and its lack of neighborhood and minority representation, and launched a campaign in the mid–1970s to establish an elected board using single member districts. The campaign culminated in a referendum election held in 1978. Despite the fact that a majority (52%) of whites voted against an elected board from single member districts, a majority of blacks (89%) voted for the referendum and it passed.

Blacks have regularly been elected to the board of education from the majority black districts.

The Hamilton County Quarterly Court, a predecessor to the current county commission, also used single member district elections. In 1972 three blacks (Greene, Tate, and Kennedy) were elected to the Quarterly Court from the majority black Fourth District.

The Hamilton County Council was created in 1941 to assume many of the duties of the preexisting Quarterly Court, and consisted of the county judge and four council members elected at-large. Although blacks ran for the council (Mapp in 1966; Green in 1974; Mapp, Cotton, and Moore in 1978) no blacks were ever elected under the at-large format.

In 1978 the county commission adopted nine single-member districts following a constitutional amendment requiring counties to use district voting. At the ensuing election, two blacks were elected to the commission (Taylor and McDaniel) from the two majority black districts located within the city of Chattanooga. No blacks have ever been elected from the seven majority white commission districts.

Under the at-large system of elections formerly used by the City of Chattanooga only one black had ever been elected to the commission. After the at-large system was invalidated under Section 2 on vote dilution grounds, the city adopted a system of district voting. Under the new system of district elections blacks have regularly been elected to the city council.

### THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP IN THE STATE OR POLITICAL SUBDIVISION BEAR THE EFFECTS OF DISCRIMINATION IN SUCH AREAS AS EDUCATION, EMPLOYMENT AND HEALTH, WHICH HINDER THEIR ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL PROCESS

Segregation in the schools at all levels was repeatedly affirmed. Jim Crow laws required segregation in railroad passenger cars, and even in coal mines. These laws were challenged but were held to be constitutional. *Murphy v. Western & A.R.R.*, 23 F. 637 (D.Tenn.1885).

The Chattanooga city commission in the conduct of its business regularly enforced the laws and customs of racial segregation, *e.g.*, authorizing the establishment of a "colored" orphanage in 1922.

In 1942 the state supreme court held that qualified blacks could be denied admission to the College of Law of the University of Tennessee.

The Grand Dragon of the Ku Klux Klan noted in 1946 that there was "a strong Chattanooga Klan."

A five-part, 340-page report by the National Urban League in 1947 documented the continuing existence of segregation in Chattanooga and the depressed socioeconomic conditions of blacks. Some of the report's major findings were: housing for blacks was substandard and a majority of blacks were in the lowest income brackets; many black schools were "housed in places that ought to be condemned;" 70% of all working blacks were in the lowest income jobs—service, janitors, porters, and other unskilled categories; 59 of the local labor unions were composed of whites only; most black businesses catered to the needs of blacks that were not met by white establishments, such as barber shops, cleaning establishments, and taxicabs and jitney services; the only city hospital that would admit black doctors for practice was Carver Hospital for Negroes; no city hospital provided nursing training for blacks; segregated health care for blacks was generally inferior and the professional attention scant or inadequate; Erlanger Hospital operated a "colored section" for blacks located in the old part of the building; blacks were excluded from membership on city boards and agency staff positions; children's homes, nursery centers, and orphanages were operated on a racially segregated basis. A black policeman was suspended from the force in 1948 for arresting a white man in violation of department policy. The city commission ratified the suspension over the protests of city blacks.

In 1951 a federal court invalidated segregation at the University of Tennessee, including the College of Law, on the grounds that there was no other state institution at which the plaintiffs could obtain a legal education.

In another decision in 1952 a federal court held that segregation in the public schools was not *per se* in violation of the fourteenth amendment.

When Shepherd Hills in Ridgeside was developed in 1953, subdivision lots were deeded subject to covenants forbidding sale or rental "to any Negro, mulatto, or other person of color ... [or] to any person of Jewish or Hebrew blood."

The Men's Civic League issued a report in 1954 in which it charged that the wings of Erlanger Hospital to which black patients were assigned were "overrun by vermin" and were "completely unfit for human beings." The hospital administrator acknowledged that the board was aware of the bad conditions.

Musical events at the city auditorium in Chattanooga were customarily segregated on the basis of race. When a black took a seat in the "whites only" section during a dance in 1956, a fight broke out. The manager recommended that the board adopt a policy barring whites from black dances and barring blacks from white dances.

In 1957, after the Southern Coach Lines removed the segregated seating signs from its buses following a Supreme Court ruling that the segregation was unlawful, someone placed a dummy on the Walnut Street bridge on which was written "All NAACP bus riding niggers."

Two dynamite explosions were set off within one week in 1958 at the Phillis Wheatley Branch of the YWCA for Negroes. Hotels, train stations, drinking fountains, and city parks were all racially segregated.

Blacks were not employed in administrative positions in Chattanooga city government until 1962. The first black to be hired at city hall worked in the finance department as a clerk-typist, the lowest classification in the department. The City of Chattanooga did not open all city operated facilities to blacks until 1963. When the City of Chattanooga hired its first black bus driver in the 1960s, whites tried to intimidate him and someone shot at the bus he was driving. The University of Chattanooga was operated on a racially segregated basis until 1965. Erlanger Hospital did not desegregate its facilities until the government threatened to cut off federal funds in 1966. When the hospital's board agreed to sign a certificate of compliance with the Civil Rights Act of 1964, the president of the board resigned in protest. Blacks picketed the Chattanooga city hall in 1975 calling for equality in employment, housing, and treatment.

In 1984 a predominately black organization, Concerned Citizens, was founded to address problems of racism and police brutality in Hamilton County. Concerned Citizens has conducted prayer vigils and circulated leaflets providing information about the alleged victims of police brutality.

Churches and ministerial alliances in Hamilton County are largely segregated.

Blacks in Hamilton County had a higher risk of mortality when compared to whites for 10 of the 15 principal cause of death for 1980.

Public housing in Hamilton County is owned and operated by the Chattanooga Housing Authority (CHA). The CHA was established in 1938 to take advantage of the Housing Act of 1937, and to provide low rent housing to low income residents of the city. Housing projects were planned and constructed by the CHA, and were occupied, on a racially segregated basis, including College Hill Courts for blacks in 1941, and East Lake Courts for whites in 1940. Boone–Hysinger Homes, occupied in 1953, was exclusively white, while McCallie Homes, Poss Homes, and Emma Wheeler Homes, built in 1953, 1963, and 1964 respectively, were occupied exclusively by blacks.

After the National Urban League cited the CHA for segregation in public housing in 1964, a CHA official said that we "have always been segregated and we have never had any complaints."

Most of the projects administered by the CHA remain racially segregated to the present time: *e.g.,* Emma Wheeler Homes (98% black); Scattered Sites (97% black); Mary Walker (99% black); Maurice Poss Homes (99% black); S.J. McCallie Homes (98% black); and Harriet Tubman (90% black).

Public housing has been opposed by segments of the Hamilton County population at various times and for various reasons. In the 1940's many viewed public housing as "encroaching socialism" and unfair competition with the private sector. More recently, the City of Chattanooga rezoned a parcel of land in the Hickory Valley Road area from multi-family to single family use at the request of local whites who were opposed to the construction of a federally assisted multi-family housing project on the land. The NAACP challenged the city's rezoning decision in federal district court in 1979 as being racially discriminatory. In 1981 the court approved a consent decree in which the city agreed not to interfere with the development and construction of public housing, and to purchase the Hickory Valley Road property and deed it to the developers for construction of multi-family housing units.

Pupils in the city schools were completely segregated on the basis of race. Only black teachers and principals were assigned to the black schools, and only white teachers and principals were assigned to the white schools. The administrative staff of the school system was all white. County teacher associations were segregated.

The district court entered orders in 1962, 1965, 1967, and 1971 providing for desegregation of city schools by grades and limited busing of some elementary and junior high school students. Some 2,000 whites filed a suit in state court and secured an order enjoining the city from making available any funds for transportation of school students "to achieve a racial balance within the Chattanooga public school system." City officials voted "to comply with that order without appeal." The school board filed a motion seeking "the instructions" of the district court. The mayor and city commissioners were joined as defendants and the district court vacated the order of the state court. Many whites responded to desegregation by leaving the public schools.

During the desegregation of city schools there were racial incidents and confrontations throughout the late 1960s and early 1970s. City police were required to quell one disturbance at Brainerd High in 1970 as whites and blacks caused a near riot.

In 1975 the federal court approved a plan for desegregation of city schools even though Howard High School and Riverside High School were 99% black. According to the court of appeals, resegregation had occurred but it was the result of "a more subtle and lingering malaise of fear and bias in the private sector which persisted after curative action had been taken to eliminate the dual system itself."

The school desegregation litigation was dismissed by the court in 1986 on the basis that the board had implemented a plan ordered by the court, and that any segregation in the city schools was not a result of board action.

In 1988, 22 of the 52 schools in the city system were racially identifiable (90% or more of one race), e.g. Brainerd High School (94% black); Howard High School (99% black); Hixson High School (93% white); Lookout Valley High School (98% white); St. Elmo (95% black); Alton Park (92% black); Donaldson (91% black); Dalewood (94% black); Woodmore (98% black); etc. Approximately one-half of all students attended schools that were 90% or more of one race.

Blacks in Hamilton County, as a result of past and continuing discrimination in education, employment, and other areas, have been isolated from the economic and political main stream. They remain a socioeconomically depressed minority with a limited ability to fund and mount political campaigns.

The per capita income of whites in Hamilton County in 1989 was $15,134.00; for blacks it was $7,381.00.

In Hamilton County in 1989, 16.2% of whites and 31.2% of blacks had income below the poverty level. According to the 1990 Census, in Hamilton County 4.8% of whites and 10.9% of blacks were unemployed. According to the 1990 Census, in Hamilton County 69.3% of whites and 40.4% of blacks owned their own homes.

### THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN THE JURISDICTION

No African–American has ever been elected as a Circuit Court, Criminal Court, or

Chancery Court judge of the Eleventh Judicial Circuit in Hamilton County or a General Sessions Court judge for Hamilton County.

There are blacks in Hamilton County who have the necessary qualifications to be judges and chancellors of the Circuit Court and the Court of General Sessions, *i.e.*, who are 30 years of age and who are members of the bar. T.C.A. §§ 17–1–101, 17–1–106.

Although blacks won two of the city judicial elections, no black has ever won a majority of the votes in a county-wide judicial contest.

In the 1969 election for city judge, Harris, a black, got 96% of the black vote. His white opponent got 69% of the white vote. Despite the high level of racial bloc voting, Harris won, in part because overall voter turnout was low (20.5% of VAP), and black turnout was exceptionally high (30% for blacks compared to 15% for whites).

In the 1991 city judge election, Williams, a black, got 100% of the black vote, while his white opponent got 87% of the white vote. Black voter turnout was higher than white voter turnout and Williams was elected.

Although blacks ran for the Hamilton County Council (Mapp in 1966; Green in 1974; Mapp, Cotton, and Moore in 1978) no blacks were ever elected under the at-large format. In the 1978 county council election, the three black candidates ran first among black voters and last among white voters. Blacks have run for other county-wide offices as well. Mapp, a black, ran for county trustee in 1968 and was defeated. Mapp ran for county register in 1974 and again was defeated.

In the 1990 county-wide primary for juvenile court clerk, Swafford, a black, got 74% of the black vote. His white opponent got 74% of the white vote and won the election. Swafford ran for the Chattanooga city council in 1993 in a majority black district and was elected, beating the incumbent and getting 56% of the total vote.

*After the complaint was filed in this case*, Ardena Garth was elected public defender in 1990, the first black ever to be elected to a county-wide office in Hamilton County. The position of public defender was created in Hamilton County in 1989. The job of the public defender is to provide legal representation to indigent persons charged with crimes.

The Governor of Tennessee, defendant McWherter, appointed Ms. Garth as the first public defender of Hamilton County as part of an announced affirmative action plan. Ms. Garth ran as the incumbent in the elections in 1990.

The voting in both Ms. Garth's primary and general elections was racially polarized. In the primary Ms. Garth got 91% of the black vote, while her white opponent got 62% of the white vote. In the general election, Ms. Garth got 100% of the black vote and her opponent got 52% of the white vote.

### SUPPLEMENTAL SENATE FACTORS

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

### WHETHER THERE IS A SIGNIFICANT LACK OF RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO THE PARTICULARIZED NEEDS OF THE MEMBERS OF THE MINORITY GROUP;

The Court affirms and adopts the defendants' findings of fact in regard to this factor which are as follows:

The Circuit Court, Chancery Court, Criminal Court and General Sessions Court Judges of Hamilton County are responsive to the particularized needs of members of the black community in Hamilton County inasmuch as these judges are fair and impartial in the disposition of matters before them.

Specifically, there is no proof that any of the present judges have discriminated against any African–Americans who have been involved in the judicial process as plaintiffs, defendants, attorneys, jurors, or witnesses.

Although the Court requested from the State a comparison of sentencing ranges from black and white defendants, the State declined to provide these statistics, maintaining the position that these figures were not available.

There is no proof that the establishment and maintenance of the present judicial system in Hamilton County was in any way a pretext for diluting minority voting rights.

***WHETHER THE POLICY UNDERLYING THE STATE OR POLITICAL SUBDIVISION'S USE OF SUCH VOTING QUALIFICATION, PREREQUISITE TO VOTING, OR STANDARD, PRACTICE OR PROCEDURE IS TENUOUS***

■ The State contends that it has a vital interest in the at-large election of the separate circuit court, chancery court, criminal court and general sessions court judges in Hamilton County. The State contends that the method of electing these judges with their jurisdiction being coextensive with the electorate is a strong factor weighing in favor of finding no violation under Section 2 of the Voting Rights Act in this case.

The defendants contend that any of the alternative mechanisms for electing judges in Hamilton County proposed by the plaintiffs would undermine this vital state interest. The State contends that the subdistrict election of judges would destroy the State's interest in ensuring that the electorate and jurisdiction of each judge are coextensive. A limited or cumulative voting scheme would undermine the judicial system by fostering the creation of particular non-geographic constituencies to which judicial candidates would respond.

The Court finds as a matter of law that this policy underlying the practice of linkage in the election of judges is a substantial state interest. *League of United Latin Amer. Citizens v. Clements,* 999 F.2d 831, 871 (5th Cir.1993). In *LULAC* at 876–877, the Court did not find that vote dilution outweighed the state interest, because the Court found that in six of the nine counties involved that the minority-preferred candidate did not lose "on account of race," but rather due to partisan affiliation unaffected by racial politics.

However, in this case, the Court finds that under the totality of the circumstances as set out above utilizing the Gingles preconditions and the Senate factors, that Tennessee's state interest in at-large elections will not suffice to overcome a violation of Section 2, because it is overcome by the substantial dilution of black voting strength that it produces in Hamilton County. *Houston Lawyers' Assn. v. Atty. Gen.,* 501 U.S. 419, 426–27, 111 S.Ct. 2376, 2381, 115 L.Ed.2d 379, 387 (1991), *LULAC,* at 876. The Court specifically finds that based upon the evidence as a whole, as set out herein, that minority-preferred candidates do lose "on account of race" and not due to any particular partisan affiliation.

***ABILITY TO INFLUENCE CLAIM***

As stated in *Gingles, supra,* at 47, 106 S.Ct. at 2764, "[t]he essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."

■ Significantly, n. 12 of *Gingles* states as follows:

> The claim we address in this opinion is one in which the plaintiffs alleged and attempted to prove that their ability *to elect* the representatives of their choice was impaired by the selection of a multimember electoral structure. We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability *to influence* elections.

> We note also that we have no occasion to consider whether the standards we apply to respondents' claim that multimember districts operate to dilute the vote of geographically cohesive minority groups that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of the challenged multimember districts, are fully pertinent to other sorts of vote dilution claims, *such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.* (emphasis added).

Based upon the qualifying language of n. 12, the Court finds that *Gingles* three pre-conditions applies only to claims by minorities that multimember electoral structures impair their ability to elect, and that because this case also involves a single at-large district which allegedly impairs their ability to influence, that the absence of *Gingles* preconditions is not fatal to the claim of the plaintiffs that multimember electoral structures also impair their ability to influence an election in regard to a two-seat configuration, corresponding to the number of judges for the Chancery Court, even though blacks would not constitute a majority in a single-member district.

The Court finds that to allow an "ability to influence" claim would not undermine *Gingles,* because *Gingles* at 46 n. 12, 106 S.Ct. at 2764 n. 12 clearly indicates that the only type of claim before the Court is a Section 2 claim that plaintiffs' ability *to elect* has been impaired by the selection of a *multimember* electoral structure. Therefore, the Court finds that *Gingles* preconditions are inapplicable to the plaintiffs' claim in this case that the manner in which an at-large district impairs their ability *to influence.*

To apply the *Gingles* requirement that a minority must be able to show that it would constitute a majority in any type of district to all challenges to electoral systems is tantamount to a holding that there can be no purely *influence* claims, because the minority must meet a threshold showing that they have the ability to *elect.* The Court finds that *Gingles* clearly does not encompass such a holding, but in fact, expressly reserves the criteria for an influence claim and/or for challenges to other districts for a later day.

The Court also notes that the Senate Report as previously cited herein expressly directs an inquiry into whether or not the totality of the circumstances indicates that the voting strength of minority voters has been "minimized or cancelled out." This is clearly inclusive of an influence type claim such as the plaintiffs have alleged in this case. The Court also finds it significant that the legislative history of Section 2 as set out in this Senate Report makes no requirement that a minority establish that it constitutes a majority in a district in order to prevail in a Section 2 claim.

The Court finds that based upon the totality of the circumstances as set out herein, although blacks do not constitute a majority in a single-member district based upon a two-seat configuration, corresponding to the number of judges for the Chancery Court, blacks would constitute an influence district. Modifying the plaintiffs' four district plan into a two district plan, it is apparent that if districts 1 and 2 are combined this results in one district which will have a 30 percent black voting age population. Therefore, the Court finds that use of a single-district plan clearly minimizes and impairs the ability of the minority to influence the outcome of an election, while use of two districts would serve to minimize the inequality now present in the opportunity to elect by black and white voters in regard to the judges from the Chancery Court.

## CONCLUSION

The Court finds that the plaintiffs have met the three *Gingles* preconditions, and that in regard to the four seat configuration as well as the three seat configuration proposed by the plaintiffs, plaintiffs have shown a reasonable benchmark to evaluate the challenged voting practice because they have shown the ability to elect Circuit, Criminal, and General Sessions Judges. The Court also finds that the challenged voting practice substantially dilutes the plaintiffs' opportunity to participate in the electoral process. In addition, the Court finds that based upon the totality of the circumstances, including the presence of five of the seven Senate factors in this cause, the plaintiffs have shown that the result of the use of a single at-large district in regard to the election of Circuit Court Judges, Criminal Court Judges, General Sessions Judges, and Chancellors in Hamilton County dilutes the effectiveness of the minority vote, and which results in a substantial abridgment of the right of the minority to vote. *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991). The Court finds that under the facts of this case that the minority plaintiffs have been denied equal access to the political process, *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115

L.Ed.2d 348 (1991), and that the proof of substantial vote dilution shown by the totality of circumstances in this case, overcomes the defendants' substantial state interest in linkage. *LULAC, supra* at 876.

However, recognizing the substantial state interest in linkage involved, the Court suggests that the defendants are not limited, insofar as a remedy to this Voting Rights Act violation is concerned, to a system of districting such as was suggested by the plaintiffs, but may pursue a non-district remedy such as cumulative voting. As stated by Justice O'Connor, concurring in part and concurring in judgment,

> In principle, cumulative voting and other non-district-based methods of effecting proportional representation are simply more efficient and straightforward mechanisms for achieving what has already become our tacit objective: roughly proportional allocation of political power according to race.

*Holder, supra* at ——, 114 S.Ct. at 2601, 129 L.Ed.2d at at 714.

This is the second opinion written by this Court on the same record. The Court has attempted to write a definitive opinion setting out the reasoning in finding that these plaintiffs are entitled to prevail. The Court has also observed in the courtroom the presence of the African–American plaintiffs and African–Americans who have run for public office in Hamilton County, knowing they had no chance to win, fighting hard to participate in the political process in Hamilton County in a meaningful way, trying to change the system so that they would have a reasonable expectation of being allowed to have some opportunity of success in elections. From all of the above, the Court strongly **FINDS** that the plaintiffs in this case are justly entitled to the redress sought.

Accordingly, it is hereby **ORDERED** that the Tennessee State Legislature will have ninety (90) days from the date hereof to submit a proposed plan to the Court to remedy this Voting Rights Act violation.